UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

| | | |
|---|---|---|
| TRINITY HOMES LLC and BEAZER HOMES INVESTMENTS LLC, | ) ) ) | |
| Plaintiffs, | ) ) | 1:04-cv-1920-SEB-DML |
| vs. | ) ) | |
| OHIO CASUALTY INSURANCE COMPANY and CINCINNATI INSURANCE COMPANY, | ) ) ) ) | |
| Defendants. | ) | |

**ORDER ADDRESSING MOTIONS FOR SUMMARY JUDGMENT**

This cause is before the Court on the following motions: Defendant Ohio Casualty

Insurance Company's Motion for Summary Judgment [Docket No. 273], filed on

November 3, 2008; Defendant Cincinnati Insurance Company's Motion for Summary

Judgment [Docket No. 276], filed on November 3, 2008; Plaintiffs Trinity Homes LLC's

and Beazer Homes Investments LLC's ("Plaintiffs") Motion for Partial Summary

Judgment Against Cincinnati Insurance Company [Docket No. 287], filed on November

3, 2008; Plaintiffs' Motion for Partial Summary Judgment Against Ohio Casualty

Insurance Company [Docket No. 289], filed on November 3, 2008; Plaintiffs' Motion for

Oral Argument [Docket No. 314], filed on December 19, 2008; Plaintiffs' Motion to

Strike [Docket No. 320], filed on January 12, 2009; and Defendants' Motion to Strike

[Docket No. 330], filed on January 29, 2009.

For the reasons detailed below, Ohio Casualty's Motion for Summary Judgment is GRANTED; Cincinnati Insurance's Motion for Summary Judgment is GRANTED; Plaintiffs' Motion for Partial Summary Judgment Against Cincinnati Insurance is DENIED; Plaintiffs' Motion for Partial Summary Judgment Against Ohio Casualty is DENIED; Plaintiffs' Motion for Oral Argument is DENIED; Plaintiffs' Motion to Strike is GRANTED; and Defendants' Motion to Strike is DENIED.

## ***Factual Background***

*A. The Parties*

Plaintiff Trinity Homes LLC ("Trinity") is an Indiana limited liability company with its principal place of business in Indiana.  Plaintiff Beazer Homes Investments LLC ("Beazer") is a limited liability company incorporated under the laws of Delaware with its principal place of business in Atlanta, Georgia.  Plaintiffs are in the business of residential real estate development and construction.  Am. Compl. ¶ 6, 7.

Defendant Ohio Casualty Insurance Company ("Ohio Casualty") is a corporation incorporated under the laws of Ohio with its principal place of business in Ohio. Defendant Cincinnati Insurance Company ("Cincinnati") is also a corporation organized under the laws of Ohio with its principal place of business in Ohio.  In addition to other business activities, Defendants sell insurance policies to commercial entities such as

Plaintiffs.  Am. Compl. ¶ 10, 14.[1]

In the case at bar, Plaintiffs allege that Defendants breached their duties to perform their coverage obligations under certain insurance contracts.

## B.  The Underlying Lawsuits

Plaintiffs acted as general contractors in the construction of numerous homes in Indiana throughout the Ohio Casualty and Cincinnati policy periods.  Beginning in 2002, purchasers of some of these homes filed lawsuits against Plaintiffs for property damage and bodily injury, alleging that the faulty work of Plaintiffs' subcontractors resulted in water intrusion, which in turn damaged various components of the purchasers' homes. Am. Compl. ¶ 2.

With the present lawsuit, Plaintiffs seek coverage related to thirteen of these underlying lawsuits, brought in Indiana state court, the nature of which, and the damages the underlying plaintiffs have claimed, are summarized as follows:

- In Colon v. Trinity Homes, LLC and Beazer Homes Investment Corp., Indiana Cause No. 29D02-0404-PL-374, a class action, the underlying plaintiffs alleged structural property damage within their homes;

- In Keenan v. Trinity Homes, LLC and Beazer Homes Investment Corp., Cause No. 29D02-0310-CT-885, the underlying plaintiffs alleged structural and "other" property damage within their homes;
- In King v. Trinity Homes, LLC, Cause No. 29D01-0303-CT-242, the underlying

---

[1]Plaintiffs originally filed this action against the following insurers: Regent Insurance Company, American Employers' Insurance Company, One Beacon Insurance Group, Illinois Union Insurance Company, Cincinnati Insurance, and Ohio Casualty.  Former Defendants One Beacon, American, Regent, and Illinois Union have been dismissed from the case.

plaintiffs alleged structural property damage within their homes;

- In <u>McCoy v. Trinity Homes, LLC and Beazer Homes Investment Corp.</u>, Cause No. 20D01-0312-1016, the underlying plaintiffs alleged structural property damage within their homes as well as "health problems" incurred by inhabitants of the homes;

- In <u>Phifer v. Trinity Homes, LLC and Beazer Homes Investment Corp.</u>, Cause No. 29D02-0309-CT-739, the underlying plaintiffs alleged structural and personal property damage within their homes;

- In <u>Summitt v. Trinity Homes</u>, Cause No. 29D02-0209-PL-763, the underlying plaintiffs alleged "real and personal property damage" within their homes;

- In <u>Hanna v. Trinity Homes, LLC and Beazer Homes USA, Inc.</u>, Cause No. 490060405-PL-00896, the underlying plaintiffs alleged structural damage within their homes as well as health problems incurred by inhabitants of the homes;

- In <u>Nash v. Trinity Homes, LLC and Beazer Homes USA, Inc.</u>, Cause No. 06D01-0406-PL-202, the underlying plaintiffs alleged structural damage within their homes as well as health problems incurred by inhabitants of the homes;

- In <u>Bouwkamp v. Trinity Homes, LLC, Beazer Homes USA, Inc., and Beazer Homes Investment Corp.</u>, Cause No. 06C010409-CT-540, the underlying plaintiffs alleged structural damage within their homes as well as health problems incurred by inhabitants of the homes;

- In <u>Jolly v. Trinity Homes, LLC and Beazer Homes</u>, Cause No. 29D03-0408-PL-771,  the underlying plaintiffs alleged structural property damage within their homes;

- In <u>Knabel v. Trinity Homes, LLC, Beazer Homes USA, Inc., and Beazer Homes Investment Corp.</u>, Cause No. 06C010410-CT-597, the underlying plaintiffs alleged structural damage within their homes as well as health problems incurred by inhabitants of the homes;

- In <u>Clouse v. Trinity Homes, LLC, Beazer Homes USA, Inc., and Beazer Homes Investment Corp.</u>, Cause No. 06C010411-CT-672, the underlying plaintiffs alleged structural damage within their homes as well as health problems incurred by inhabitants of the homes; and

- In <u>Farrow v. Trinity Homes, LLC; Beazer Homes USA, Inc.; and Beazer Homes Investment Corp.</u>, Cause No. 06C010412-CT-685, the underlying plaintiffs alleged structural damage within their homes as well as health problems incurred by inhabitants of the homes.

Am. Compl. ¶¶ 64-178.

Plaintiffs contend that the insurance policies they hold with Defendants cover the damages claimed in these underlying lawsuits.  With regard to Cincinnati, Plaintiffs seek relief in connection with all thirteen suits.  Plaintiffs' claim against Ohio Casualty, however, relates only to one of these suits, the <u>Colon</u> class action.  Am. Compl. at ¶ 64.[2]

*C.  The Insurance Policies*

The first policies in controversy are Commercial General Liability ("CGL") Policy No. PAC-366-79-56, and Umbrella Policy No. UMB-226-79-58, provided by Ohio Casualty, on which Trinity is the named insured.[3]  These policies, the "Ohio Casualty CGL Policy" and "Ohio Casualty Umbrella Policy,"  were originally issued by American National Fire Insurance Company, a member of the Great American Insurance Group. Ohio Casualty, as a transferee of certain assets of Great American Insurance Group and

---

[2]Previously, Plaintiffs asserted an indemnity claim against Ohio Casualty related to <u>Nash</u>, but Plaintiffs have withdrawn this indemnity claim after settling their claim for defense costs related to that lawsuit.

[3]Following Trinity Homes, Inc.'s conversion to a limited liability company, Trinity Homes LLC was added as a named insured on this policy.  The parties dispute whether Trinity and Beazer, or Trinity alone, may claim coverage as an insured under the Ohio Casualty Policies. Although Trinity is a subsidiary of Beazer, Trinity has never sought to add Beazer as a named insured or additional insured under the Ohio Casualty Policies.

American National Fire Insurance Company, succeeded to all obligations and liabilities
under the Ohio Casualty Policies.  Am. Compl. ¶22; Dec. of W. Mark Berry at ¶¶13, 17.
These policies were in effect from May 1, 1994 to May 1, 1999, with separate limits of
liability for each annual policy period. Id. at ¶21.

      The Ohio Casualty CGL Policy Insuring Agreement provides the following
coverage: "We will pay those sums that the Insured becomes legally obligated to pay as
damages because of 'bodily injury' or 'property damage' to which this insurance
applies."  Ohio Casualty CGL Policy § I.A.1.a.  The insuring agreement of the Ohio
Casualty Umbrella Policy, which provides Plaintiffs with excess insurance beyond the
underlying insurance held in the CGL policy, provides, in pertinent part, that Ohio
Casualty will pay "on behalf of the 'Insured' those sums in excess of the 'Retained Limit'
that the 'Insured' becomes legally obligated to pay . . . ."  Ohio Casualty Umbrella Policy
§ I.A.1.a.

      Also at issue is Commercial Umbrella Liability Policy No. CCC 4445840, issued
by Cincinnati ("Cincinnati Policy").  This policy was originally purchased by Crossman
Communities, Inc. ("Crossman").  However, because Trinity was a wholly-owned
subsidiary of Crossman, and Crossman has since merged with Beazer, Plaintiffs assert
that this policy provides coverage for the losses in question here.[4]  The Insuring

_____

      [4]Crossman owned 50 percent of Trinity's stock prior to October 24, 2000, and 100
percent of Trinity's stock after that date.  On April 17, 2002, Beazer Homes Investment
Corporation acquired the stock of Crossman and Crossman was merged into Beazer Homes.  On
December 30, 2004, Beazer Homes Investment Corporation was converted into a Delaware

                                                          (continued...)

Agreement in the Cincinnati Policy provides, in pertinent part, as follows:

> We will pay on behalf of the insured the "ultimate net loss" which the insured is legally obligated to pay as damages in excess of the "underlying insurance" or for an "occurrence" covered by this policy which is either excluded or not covered by "underlying insurance."

Cincinnati Policy § I.A.  This policy was in effect from July 1, 1998, to July 1, 2002.  Am. Compl. ¶ 53.

1.  "Property Damage" Caused by an "Occurrence"

The purpose of the Ohio Casualty and Cincinnati Policies is to insure Plaintiffs against unexpected, accidental liability arising out of the construction and sale of homes. To effect that coverage, the Ohio Casualty policies "appl[y] to 'bodily injury' or 'property damage' only if . . . the 'bodily injury' or 'property damage' is caused by an occurrence." Ohio Casualty CGL Policy § I.A.1.b.  The Cincinnati Policy covers the same damage: "'[b]odily injury' or 'property damage' covered by this policy occurring during the policy period and caused by an 'occurrence.'"  Cincinnati Policy § I.A.

The Ohio Casualty policies define "property damage" as "physical injury to tangible property, including all resulting loss of use of that property," and "loss of use of tangible property that is not physically injured."  Ohio Casualty CGL Policy § V.15.

---

[4](...continued)
limited liability company and became known as Beazer Homes Investments LLC.  Trinity maintained its status as a limited liability company through these transactions. Dec. of Berry ¶¶ 6, 8.

Similarly, the Cincinnati Policy defines "property damage" as "physical injury to or destruction of tangible property, including all resulting loss of use."  Cincinnati Insurance Policy § V.12.a. "Occurrence," under each of these policies is defined as an "accident, including continuous or repeated exposure to substantially the same general harmful conditions."  E.g. Ohio Casualty CGL Policy §V.12.

Seeking to enforce the terms of these policies, Plaintiffs request the following relief: (1) a declaration that the policies issued by Defendants provide coverage for the damages claims made against Plaintiffs in the underlying state court litigation, and that Defendants breached their contracts with Plaintiffs by failing to perform their duties under the policies; (2) a declaration that Ohio Casualty is estopped from asserting any defenses to coverage under the insurance policies; and (3) damages to compensate Plaintiffs for all losses covered under the policies.  Am. Compl. ¶¶ 179, 214-15, 261-64.

## *Legal Analysis*

### I.      *Standard of Review*

Summary judgment is appropriate when the record establishes that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party.  Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 248 (1986).  In deciding whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party.  See id. at 255. However, neither the "mere existence of some alleged factual dispute between the parties," id. at 247, nor the existence of "some metaphysical doubt as to the material facts," Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986), will defeat a motion for summary judgment.  Michas v. Health Cost Controls of Illinois, Inc., 209 F.3d 687, 692 (7th Cir. 2000).

The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323. The party seeking summary judgment on a claim on which the non-moving party bears the burden of proof at trial may discharge its burden by showing an absence of evidence to support the non-moving party's case.  Id. at 325.

Summary judgment is not a substitute for a trial on the merits, nor is it a vehicle for resolving factual disputes.  Waldridge v. Am. Hoechst Corp., 24 F.3d 918, 920 (7th Cir. 1994).  Thus, after drawing all reasonable inferences from the facts in favor of the non-movant, if genuine doubts remain and a reasonable fact-finder could find for the party opposing the motion, summary judgment is inappropriate.  See Shields Enter., Inc. v. First Chicago Corp., 975 F.2d 1290, 1294 (7th Cir. 1992); Wolf v. City of Fitchburg, 870 F.2d 1327, 1330 (7th Cir. 1989).  But if it is clear that a plaintiff will be unable to

9

satisfy the legal requirements necessary to establish her case, summary judgment is not only appropriate, but mandated.  See Celotex, 477 U.S. at 322; Ziliak v. AstraZeneca LP, 324 F.3d 518, 520 (7th Cir. 2003).   Further, a failure to prove one essential element "necessarily renders all other facts immaterial."  Celotex, 477 U.S. at 323.

Courts are often confronted with cross-motions for summary judgment because Rules 56(a) and (b) of the Federal Rules of Civil Procedure allow both plaintiffs and defendants to move for such relief.  "In such situations, courts must consider each party's motion individually to determine if that party has satisfied the summary judgment standard."  Kohl v. Ass'n. of Trial Lawyers of Am., 183 F.R.D. 475 (D. Md.1998). Thus, in determining whether genuine and material factual disputes exist in this case, the Court has considered the parties' respective memoranda and the exhibits attached thereto, and has construed all facts and drawn all reasonable inferences therefrom in the light most favorable to the respective non-movant.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986).

## II.  *Application of Indiana Law*

Jurisdiction over this case is based on diversity of citizenship among the parties, and the parties agree that Indiana substantive law governs.  Therefore, we apply Indiana law as we predict the Supreme Court of Indiana would apply it.  Clark v. State Farm Mut. Auto Ins. Co., 473 F.3d 708, 712 (7th Cir. 2007).  Under Indiana law, the interpretation of an insurance policy is a question of law for the Court.  Tate v. Secura Ins., 587 N.E.2d

665, 668 (Ind. 1992); see also T.R. Bulger Inc. v. Indiana Insurance Co., 901 N.E.2d

1110, 1114 (Ind.Ct.App. 2009) (holding that "the construction of an insurance policy is a

question of law for which summary judgment is particularly appropriate").  Where the

insurance policy's language is clear and unambiguous, the Court "assign[s] to the

language its plain and ordinary meaning."  Id.  If the Court determines that any language

in the policy is ambiguous, such ambiguities must be construed in favor of the insured

party (here, Plaintiffs).  Am. Family Mut. Ins. Co. v. Hall, 764 N.E.2d 780, 784

(Ind.Ct.App. 2002).

### III.  Ohio Casualty's Duty to Indemnify[5]

Plaintiffs' claim against Ohio Casualty relates to a single underlying lawsuit,

namely, the Colon class action.  The underlying plaintiffs in Colon alleged that various

homes built by Plaintiffs and their subcontractors contained faulty workmanship, which

permitted the intrusion of water that subsequently damaged components of the homes,

including exterior walls, sheetrock, drywall, interior wood, and carpeting.  See Am.

Compl. ¶ 66- 68.  In October of 2004, the state court approved a negotiated settlement in

Colon, requiring Plaintiffs to investigate and repair property damage caused by this water

---

[5]Because Trinity and Ohio Casualty resolved by settlement their dispute concerning Ohio
Casualty's duty to defend, the coverage presently sought by Trinity is for indemnity only.  Am.
Compl. ¶ 35.

intrusion.[6]  Pursuant to this agreement, Plaintiffs have allegedly incurred, as of September 30, 2008, investigative and repair costs totaling $43,169,989.12.  Aff. of Reichers ¶ 12; Dec. of Berry at ¶ 55.

In determining whether Ohio Casualty owes a duty to indemnify Trinity under the CGL Policy, resulting from the judgment in Colon, the Court undertakes a three-step inquiry:

> first, it must find "property damage" as defined in the Policy; second, it must find that this property damage was caused by an "occurrence"; and third, it must find [that] the coverage for property damage is not subject to any exclusions contained within the Policy.

Westfield Insurance Co. v. Sheehan Construction Co., Inc., 580 F.Supp.2d 701, 709 (S.D. Ind. 2008) (Young, J.), *aff'd* 564 F.3d 817 (7th Cir. 2009).

## A.  Property Damage

In order for Ohio Casualty's duty to indemnify Plaintiffs to arise, the damages repaired by Plaintiffs must constitute "property damage," as provided in the Ohio Casualty CGL Policy.  In addressing "property damage" under CGL policies, Indiana courts have noted that contractors face two basic types of risk: "1) a business risk, and 2) a risk of occurrences that give rise to insurable liability."  T.R. Bulger, 901 N.E.2d at 1115.  As contractors, Plaintiffs confront a business risk that they will be required to

---

[6]The Class, as defined in the Colon settlement, included "[a]ll owners of a residential structure in Indiana constructed and marketed by Trinity and Beazer in which a one-inch gap with a vapor barrier does not exist between an exterior brick veneer wall and the surface of the underlying exterior wall."  Am. Compl. ¶ 65.

repair faulty workmanship deemed unsatisfactory by the purchaser of a home.  Indiana

Ins. Co. v. Dezutti, 408 N.E.2d 1275, 1279 (Ind. 1980).  Under Indiana law, claims

limited to remedying faulty workmanship or materials do not involve "property damage"

as that term is used in CGL policies.  R.N. Thompson & Associates, Inc. v. Monroe

Guaranty Insurance Co., 686 N.E.2d 160, 163 (Ind.Ct.App. 1997).  Were CGL policies to

cover such "economic losses," id. at 164, the "moral hazard would be considerable: the

prospect of indemnity would lead the general contractor to save money by hiring

substandard subcontractors, then turning to the insurer to fix the customers' homes."

Westfield Insurance Co., 564 F.3d at 818.  Accordingly, the risk of faulty workmanship

"is born by the contractor and is not insured by a CGL policy." T.R. Bulger, 901 N.E.2d

at 1115.[7]

     The second kind of risk faced by contractors such as Plaintiffs is the risk "that the

goods, products or work of the insured, once relinquished or completed, will cause bodily

injury or damage to property *other than* to the product or completed work itself." R.N.

Thompson, 686 N.E.2d at 162 (emphasis in original); see also Westfield Insurance

Company, 564 F.3d at 818 (noting that CGL policies insure against tort liability, for

---

     [7]Plaintiffs argue that R.N. Thompson and Amerisure, Inc. v. Wurster Construction Co.,
Inc., 818 N.E.2d 998, 1004 (Ind.Ct.App. 2004), were wrongly decided and that their holdings are
contrary to the Indiana Supreme Court's holding in Dezutti.  However, as this Court has
recognized in the past, those holdings are entirely consistent with DeZutti, and further that
Indiana law is well established regarding the interpretation of "property damage" in CGL
policies.  Plaintiffs' argument that the Indiana Court of Appeals's recent decision in T.R. Bulger
indicates otherwise is misplaced because "T.R. Bulger reiterates rather than retreats from the
holdings of Amerisure and R.N. Thompson."  Westfield Insurance Co., 564 F.3d at 819.

example, "for loss caused by construction machinery that damage[s] adjacent property or for an injury to a passer by caused by a misplaced nail"). This "risk *is* covered by CGL policies, and serves to limit contractors' tort liability for damage to property caused by their work." Westfield Insurance Co., 580 F.Supp.2d at 710 (citing R.N. Thompson, 686 N.E.2d at 162) (emphasis in original).

Applying this distinction between the insured risk and the uninsured risk, it is clear that the cost of repairing faulty workmanship is not deemed "property damage" if the damaged property is limited to the project itself. Amerisure, Inc. v. Wurster Construction Co., Inc., 818 N.E.2d 998, 1004 (Ind.Ct.App. 2004). In Selective Insurance Co. of the Southeast v. Cagnoni Development, LLC, 2008 WL 126950 (S.D. Ind. Jan. 10, 2008) (Hamilton, J.), faulty workmanship in a warehouse resulted in water damage to the warehouse itself as well as to personal property contained in the warehouse. This Court thus held that, while damage to the personal property did constitute "property damage" covered by a CGL policy, damage to the warehouse itself was not "property damage." Id. at *11-12. A sister federal district court applying Indiana law to facts very similar to those in the case at bar held similarly that "any damage that did not extend beyond the faulty workmanship of the general contractor-insured is not considered 'property damage' under Indiana law." Cincinnati Insurance Co. v. Crossman Communities Partnership, 2008 WL 817086, at *10 (E.D. Ky. Mar. 20, 2008); see also Westfield Insurance Co., 580 F.Supp.2d at 711-713. Therefore, the insured seeking coverage must demonstrate that some property other than the project itself - that is to say, something other than the homes

14

constructed by Plaintiffs and their subcontractors - was damaged.

The damages the underlying plaintiffs in <u>Colon</u> claimed were limited to previously non-faulty fixtures and components of the homes, including walls, sheetrock, interior wood and carpeting.  It is clear from the record that, except for one instance of damage associated with "lot SPC 140," <u>Colon</u> involved no damage to personal property.[8]  Beyond this single instance, Plaintiffs have not adduced any evidence to substantiate damages to personal property or any other property distinct from the homes themselves.[9]

Consistent with the holdings of <u>R.N. Thompson</u>, <u>Westfield Insurance Co.</u>, <u>T.R. Bulger</u>, <u>Crossman</u>, and <u>Sheehan Construction Company, Inc. v. Continental Casualty Company</u>, 908 N.E.2d 305 (Ind.Ct.App. 2009), we reject Plaintiffs' attempts to "artificially parse the parts of the house into separate 'component' work products."

---

[8]In that one instance, Trinity agreed to pay $1600.00 to the owners of the home at lot SPC 140 for personal property damaged by water intrusion.  Aff. of Pamela K. Yarbery at ¶ 9. Ohio Casualty does not dispute the damage claim related to lot SPC 140.  Under the holdings of <u>Amerisure</u> and <u>Selective Insurance</u>, this claim does constitute "property damage" under the CGL policy.

[9]In an attempt to circumvent this lack of evidence, Plaintiffs point to the testimony of Defendants' corporate representatives, in which, Plaintiffs contend, they admitted that the underlying claims in this suit involved "property damage."  However, the statements of a company representative do not trump clear contract language and well established Indiana law defining the term "property damage."  <u>See</u> <u>Cinergy Corp. v. Associated Elec. & Gas Ins. Services, Ltd.</u>, 865 N.E.2d 571 (Ind. 2007) (rejecting the use of "extrinsic facts" to create a legal issue as to the interpretation of a contract); <u>Prudential Ins. Co. Of America, Inc. v. Superior Court</u>, 98 Cal.App.4th 585, 599 (Cal.Ct.App. 2002) ("The opinions of claims adjusters or other agents or employees of the insurer are also inadmissible to interpret an insurance contract."). Moreover, Defendants' employees' statements in this regard are substantively lacking as to the definition of "property damage" because those statements are ambiguous and equivocal.

Crossman, 2008 WL 817086, at *20.[10]  Here, as in <u>Westfield Insurance Co.</u>, the "damage
to the Class Members' homes, although caused by water penetration and not faulty
workmanship directly, is not to be treated as distinct from the underlying faulty
workmanship which allowed the water penetration."  580 F.Supp.2d at 711.  Therefore,
we conclude that, beyond the one instance of lot SPC 140, no "property damage" is
present in Plaintiffs' claim against Ohio Casualty and, as such, Ohio Casualty does not
owe Plaintiffs a duty to indemnify beyond that single claim.

*B.  Occurrence*

   Even if the water damage caused by the faulty workmanship of Plaintiffs and their
subcontractors constituted "property damage" under the CGL Policy, that "property
damage" must also have been caused by an "occurrence."  Ohio Casualty Policy §
I.A.1.b; <u>see also</u> <u>Westfield Insurance Co.</u>, 580 F.Supp.2d at 713.  The Ohio Casualty
Policies define "occurrence" as an "accident, including continuous or repeated exposure
to substantially the same general harmful conditions."  Ohio Casualty CGL Policy §V.12.
Although "accident" is not defined in the policy, as the court in <u>R.N. Thompson</u>
explained, in the context of insurance coverage, an "accident" is "an unexpected
happening without an intention or design."  686 N.E.2d at 164.

_____

[10]Moreover, we reject Plaintiffs' request that we certify the issues presented in this case
to the Indiana Supreme Court for clarification.  Certification is appropriate when a federal court
is presented with "novel or unsettled questions of state law."  <u>Arizonans for Official English v.
Arizona</u>, 520 U.S. 43, 46 (1997).  Indiana courts have adopted clear and controlling precedent
governing the issues in this case.  Therefore, certification is unwarranted.

In <u>Westfield Insurance Co.</u>, our colleague, Judge Young, reviewed Indiana law regarding the application of "occurrence" and "accident" in CGL policies and concluded that Indiana courts adhere to the rule that "the natural and ordinary consequences of an act do not constitute an accident."  580 F.Supp.2d at 714.  Thus, "based on the faulty workmanship [in <u>Westfield</u>], including improperly sealed window joints and a lack of house wrap, the fact that water penetrated the homes [was] certainly the natural and ordinary consequence of the defects."  <u>Id.</u>; <u>see also</u> <u>R.N. Thompson</u>, 686 N.E.2d at 165 (holding that degradation of plywood used in roof decking was the natural and ordinary consequence of the work done by the contractor or its subcontractors and was thus not an "accident" or "occurrence"); <u>Amerisure</u>, 818 N.E.2d at 1005 (holding that the failure of exterior finishing systems was the natural and ordinary consequence of the defective work done under the contractor's supervision); <u>Jim Barna Log Systems Midwest, Inc. v. General Casualty Insurance Co. of Wisconsin</u>, 791 N.E.2d 816 (Ind.Ct.App. 2003).[11]

Applying Indiana law, we thus conclude that the water damage to components of the homes in this case was nothing more nor less than the natural and ordinary

---

[11]Again, Plaintiffs urge the Court to disregard Indiana precedent and focus instead on the holdings of other state courts.  Although Plaintiffs point to numerous decisions from supreme courts of other states disagreeing in part with Indiana law regarding the definition of "occurrence," Plaintiffs have given us no reason to believe that the Indiana Supreme Court would depart from the holdings of <u>R.N. Thompson</u>, <u>Amerisure</u>, and <u>T.R. Bulger</u>, as well as the recent decision in <u>Sheehan Construction Company, Inc. v. Continental Casualty Company</u>, 908 N.E.2d 305 (Ind.Ct.App. 2009) .  Moreover, like the Seventh Circuit in <u>Westfield Insurance Co.</u>, we reject Plaintiffs' contention that these Indiana cases ignored a 1986 change to the trade association's form policy.  <u>Westfield Insurance Co.</u>, 564 F.3d at 819 ("How a change in 1986 can supersede judicial decisions in 1997 and 2004 is anyone's guess.").

consequence of faulty workmanship, and was thus not an "accident."  It follows that none of this underlying damage was caused by an "occurrence" as defined in the Ohio Casualty Policies.  Where Plaintiffs have shown "property damage" in relation to lot SPC 140, discussed above, Defendants pose no objection to deeming this "property damage" to have been caused by an "occurrence."  In fact, Ohio Casualty "agrees to a judgment against it in the amount of $1600.00 based on the damages to personal property of the homeowners of SPC 140."  Def.'s Br. in Supp. at 29.  Accordingly, we hold that Ohio Casualty owes Plaintiffs a duty to indemnify on this one claim, but does not owe Plaintiffs a duty to indemnify for any other costs related to the underlying lawsuit.[12]

Under Indiana law, "if the insuring clause does not extend coverage, one need look no further."  Crossman, 2008 WL 817086, at *11 (citing Amerisure, 818 N.E.2d at 1005).  Having determined that, aside from the one instance noted, Ohio Casualty owes no duty to indemnify because there was no "property damage" that was caused by an "occurrence," the Court need not consider the relevancy of any exclusions.[13]

---

[12]The parties also dispute whether the Ohio Casualty Umbrella policy provides excess coverage beyond the coverage provided by the CGL policy.  The Umbrella Policy provides coverage for damages in excess of the primary limits for "bodily injury" or "property damage" caused by an "occurrence."  Ohio Casualty Excess Policy §§ I.A.1, V.D.  Having found that the underlying coverage in the CGL Policy is not exhausted, we do not reach the issue of excess coverage under the Umbrella policy.

[13] The parties devote portions of their briefing to the "Damage to Your Product" exclusion of the Ohio Casualty CGL Policy, as well as to other potential exclusions to coverage.  However, because Plaintiffs' claim "fails the definitional requirements of the terms 'property damage' and 'occurrence' in order for coverage to apply, we do not reach the applicability of the various exclusions."  Amerisure, 818 N.E.2d at 1005.  Further, Defendants concede that these
(continued...)

For all of the foregoing reasons, and because no genuine issues of material fact are present, Ohio Casualty's Motion for Summary Judgment shall be <u>granted</u>, and Plaintiffs' Motion for Partial Summary Judgment Against Ohio Casualty shall be <u>denied</u>.

**IV.  Plaintiffs' Claims Against Cincinnati Insurance**

Plaintiffs assert that Cincinnati owes two contractual duties under the Cincinnati Policy: a duty to indemnify and a duty to defend Plaintiffs against the underlying lawsuits.  Before reaching the issue of coverage under the Cincinnati Policy, we address the parties' respective underlying motions to strike as well as Cincinnati's contention that Plaintiffs' claims are barred by claim preclusion.

*A.  Plaintiffs' Motion to Strike*

Plaintiffs contend that certain errata sheets submitted by Cincinnati in connection with Beazer's Rule 30(b)(6) depositions of Timothy Huntington and Troy Reichers should be stricken.  During the Rule 30(b)(6) depositions, Huntington, one of Cincinnati's corporate representatives, testified about what might and might not constitute "property damage" under the Cincinnati Policy.  <u>E.g.</u>, Dep. of Huntington at 96-99.  Reichers,

---

[13](...continued)
exclusions do not apply to the "property damage" at lot SPC 140.  Plaintiffs' Complaint also asserts a claim that Ohio Casualty is estopped from asserting exclusions to coverage because of the alleged delay in Ohio Casualty's initial response to Trinity's request for coverage.  Because we do not reach the applicability of the Policy's exclusions, Plaintiffs' claim of estoppel is moot. <u>See</u> <u>Employers Ins. of Wausau v. Recticel Foam Corp.</u>, 716 N.E.2d 1015, at 1029 n.16.

another designated representative, testified about his awareness of communications between Cincinnati and Trinity relating to the policy.  Dep. of Reichers at 68.  Soon after these witnesses provided their deposition testimony, Cincinnati submitted errata sheets, pursuant to Rule 30(e), altering numerous answers given by these designated witnesses. Fed.R.Civ.P. 30(e).

Plaintiffs point to at least ten instances in which Cincinnati altered the substance of Huntington's answers,[14] and three instances in which Reichers's answers were substantively changed.[15]  Plaintiffs contend that, with these alterations, Cincinnati impermissibly attempted to delete or alter damaging testimony, and that therefore these portions of the errata sheets should be stricken.

Under Federal Rule of Civil Procedure 30(e), a party may submit errata sheets making "changes in form *and substance* to a deposition transcript." Paul Harris Stores, Inc. v. PricewaterhouseCoopers, LLP, 2006 WL 2644935, at *2 (S.D. Ind. Sept. 14, 2004) (McKinney, J.) (emphasis added).  The rule thus "permits a party to change a deposition from what he or she said to what he or she means, although the rule requires that the original transcript be retained so that the trier of fact can evaluate the honesty of the alteration."  Id. (quoting Thorn v. Sundstrand Aerospace Corp., 207 F.3d 383, 389 (7th

---

[14]These portions include changes to Huntington's testimony contained in the errata sheets as follows: Huntington Errata Sheet at 2, entry 2; at 2, entry 3; at 2, entry 5; at 3, entry 1; at 3, entry 4; at 3, entry 5; at 4, entry 2; and at 4, entry 3.

[15]These portions include changes to Reichers's testimony contained in the errata sheets as follows: Reichers's Errata Sheet at 1, entry 3; at 1, entry 4; and at 1, entry 5.

Cir. 2000)).  A "change of substance which actually contradicts the transcript is impermissible unless it can plausibly be represented as the correction of an error in transcription, such as dropping a 'not.'" <u>Thorn</u>, 207 F.3d at 389.

Although Cincinnati contends that the changes made merely clarified answers to ambiguous questions, our review leaves us firmly convinced that this contention is disingenuously made.  It is apparent to us that the specific portions of Cincinnati Insurance's errata sheets noted by Plaintiffs reflect attempts to "'undo' the testimony of its 30(b)(6) witnesses." <u>Paul Harris Stores, Inc.</u>, 2006 WL 2644935, at *3.  These alterations sought to "impermissibly change the factual testimony offered," a "tactic which has been rejected by" numerous courts. <u>Id</u>. (citing <u>Eckert v. Kemper Fin. Servs., Inc.</u>, 1998 WL 699656 (N.D. Ill. 1998)).  Accordingly, the errata sheet changes are impermissible, and Plaintiffs' Motion to Strike shall be <u>granted</u>.[16]

*B. Defendant's Motion to Strike*

Cincinnati argues that Plaintiffs' Surreply to Cincinnati's Motion for Summary Judgment should be stricken because the substance of the Surreply exceeds its

---

[16]Notwithstanding this conclusion, Huntington's testimony is less substantively convincing than may have Plaintiffs hoped.  We note once again that the ambiguous statements of Cincinnati Insurance's 30(b)(6) representative do not negate clear contract language and well established Indiana law defining the term "property damage." <u>See</u> <u>Cinergy Corp.</u>, 865 N.E.2d 571; <u>Prudential</u>, 98 Cal.App.4th at 599.

permissible scope.[17]  Local Rule 56.1(d) limits surreply briefs to addressing: (1) evidence

not previously cited; and (2) objections to the admissibility of evidence.  According to

Cincinnati, Plaintiffs' Surreply engaged in new and impermissible argumentation.

However, upon reviewing the Surreply, we conclude that the briefing is clearly limited to

addressing arguments based on newly cited evidence.  Therefore, the Surreply conforms

to the strictures of Local Rule 56.1, and Cincinnati's Motion to Strike shall be <u>denied</u>.


*C. Claim Preclusion*

According to Cincinnati, the doctrine of claim preclusion bars Plaintiffs from

litigating the issues before the Court.  Specifically, Cincinnati argues that the decision in

<u>Cincinnati Insurance Co. v. Crossman Communities Partnership</u>, 2008 WL 817086, at

*10 (E.D. Ky. Mar. 20, 2008), forecloses the present claims.  Claim preclusion is a matter

of state substantive law, and based on a careful analysis of the elements of claim

preclusion, we hold that Plaintiffs' claims are not barred under either Kentucky or Indiana

law.  Under Kentucky law, three elements must be met for claim preclusion to apply: (1)

identity of the parties; (2) identity of the causes of action; and (3) a resolution of the

action on the merits.  <u>Jellinick v. Capitol Indem. Corp.</u>, 210 S.W.3d 168, 171 (Ky.Ct.App.

2006); <u>see also</u> <u>In re L.B.</u>, 889 N.E.2d 326, 333 (Ind.Ct.App. 2008) (listing the four

---

[17]In its original Motion to Strike, Cincinnati Insurance also interposed an argument
related to the untimeliness of Plaintiffs' Surreply.  Cincinnati Insurance has since withdrawn this
argument.  <u>See</u> Notice to Partially Withdraw [Docket No. 332].

elements of Indiana claim preclusion law, which mandates the same result as Kentucky law).

Although it is arguably true that the parties are identical, and that the <u>Crossman</u> Court reached a resolution on the merits, Cincinnati's claim preclusion argument fails on the second element. Claims are only identical if they arise from the "same transactional nucleus of facts." <u>Yeoman v. Commonwealth</u>, 983 S.W.2d 459, 465 (Ky. 1998); <u>see also</u> <u>State v. King</u>, 413 N.E.2d 1016, 1022 (Ind.Ct.App. 1980). The <u>Crossman</u> case involved homes constructed in Kentucky, whereas the case at bar involves homes constructed in Indiana. A series of other facts thus further distinguish the two cases. Cincinnati contends that the cases are "virtually identical," but the underlying facts and damages, though similar, are simply not identical. Therefore, Plaintiffs' claims against Cincinnati are not barred by claim preclusion.[18]

---

[18]Believing that Cincinnati may have intended to argue that issue preclusion, rather than claim preclusion, applied to bar Plaintiffs' claims, Plaintiffs raised the question of issue preclusion. Issue preclusion "foreclos[es] relitigation in a subsequent action of an issue of law or fact that has been actually litigated and decided in [an] initial action." <u>Havoco of Am., Ltd. v. Freeman, Atkins & Coleman, Ltd.</u>, 58 F.3d 303, 307 (7th Cir. 1995). Issue preclusion only applies when "the party against whom it is sought to be applied had a realistically full and fair opportunity to litigate the issue, and if principles of justice and fairness would be served by its application." <u>Goebel v. Arnett</u>, 259 S.W.3d 489, 492 (Ky.Ct.App. 2007). Because discovery was not completed prior to the order in the Kentucky case, and because factual differences between the two cases somewhat alter the issues presented, we are convinced that the doctrine should not be applied to bar Plaintiffs' claims. <u>See</u> <u>Young v. City of Radcliffe</u>, 561 F.Supp.2d 767, 779 (W.D. Ky. 2008) ("[P]reclusion must be 'based on rules of justice and fairness' rather than 'an automatic imposition of a doctrine.'") (quoting <u>City of Covington v. Bd. of Trustees of the Policemen's & Firefighters Ret. Fund.</u>, 903 S.W.2d 517, 522 (Ky. 1996)). The same result is mandated under Indiana law. <u>See</u> <u>Meridian Ins. Co. v. Zepeda</u>, 734 N.E.2d 1126 (Ind.Ct.App. 2000).

### D.  Coverage Under the Cincinnati Umbrella Policy

Because the Cincinnati Policy provides Umbrella coverage, or excess coverage, the question of whether that policy provides coverage for the claimed damages consists of two subparts: first, whether the applicable underlying insurance is unavailable, which is a prerequisite to the triggering of coverage under the Cincinnati Policy; and, second, if the underlying insurance is unavailable, whether the terms of the Cincinnati Policy relating to "property damage" provide coverage.  Cincinnati contends first that it owes no duties under the policy because Plaintiffs have not exhausted their underlying insurance policies.[19]

The Cincinnati policy provides for coverage as follows:

A.  Insuring Agreement

We will pay on behalf of the insured the "ultimate net loss" which the insured is legally obligated to pay as damages in excess of the "underlying insurance" or for an "occurrence" covered by this policy which is either excluded or not covered by "underlying insurance" because of:
1.      "Bodily injury" or "property damage" covered by this policy occurring during the policy period and caused by an "occurrence"; or
2.      "Personal injury" . . . covered by this policy committed during the policy period and caused by an "occurrence"

Cincinnati Policy § I.1.A.  "Underlying insurance" is defined by the terms of the policy to mean:

---

[19]This same issue was addressed, without final conclusion, in Court's prior ruling of March 30, 2007.  In that order, the Court, Judge Tinder presiding, held that material issues remained as to whether the Cincinnati policy was triggered and permitted "discovery to determine whether [Cincinnati] has a duty to defend."  Order of March 30, 2007 [Docket No. 222], at 28.  This issue reappeared in the briefing by the parties, and we now can address it on a more developed record.

> the policies of insurance listed in the Schedule of Underlying Policies and
> the insurance available to the insured under all other insurance policies
> applicable to the "occurrence."  "Underlying insurance" also includes any
> type of self-insurance or alternative method by which the insured arranged
> for funding of legal liabilities that affords coverage that this policy covers.

Id. at § V.16.

In order to clarify when underlying insurance is "available," the policy draws a distinction between full and partial payment of underlying insurance policy limits.  The policy explicates that, "if the limits of 'underlying insurance' have been *reduced* by payment of claims, this policy will continue in force as excess of the reduced 'underlying insurance.'"  Id. at § III.4.a (emphasis added).  However, if "the limits of 'underlying insurance' have been *exhausted* by payment of claims," then Cincinnati's contractual liability is triggered.  Id. at § III.4.b (emphasis added) (stating that, in the event of exhaustion, the "policy will continue in force as 'underlying insurance'").

Two matters of contract interpretation are central to the question of whether Plaintiffs' underlying insurance is currently unavailable.  First, the parties dispute whether *all* of Plaintiffs' insurance policies must be unavailable for coverage to arise under the Cincinnati policy, or whether *only* the policy explicitly listed in the Schedule of Underlying Policies need be unavailable.  The parties contend that the question requires the Court to choose between the "horizontal exhaustion theory," which Cincinnati Insurance contends requires the former formulation of coverage, and the "vertical exhaustion theory," which Plaintiffs contend requires the latter formulation of coverage.  Indiana Courts have not rendered a decision on this particular issue.  However, we need

not resolve which theory conforms to Indiana law because the language in the policy is

abundantly clear.  See T.R. Bulger, 901 N.E.2d at 1114.

       "Underlying insurance," as the phrase is used in the policy, includes "insurance

available to the insured under *all other insurance policies* applicable to the 'occurrence.'"

Cincinnati Policy § V.16.  Where the insured has both primary and excess insurance, the

excess insurer's liability only arises once all "underlying insurance," as that term is

defined in the insurance contract, is unavailable.  See, e.g. Allstate Ins. Co. v. Dana Corp.,

759 N.E.2d 1049, 1062 (Ind. 2001).  Because the Cincinnati Policy clearly defines this

term to include "all other insurance policies," all of the relevant policies must be

unavailable before Cincinnati's liability will be triggered.

       The second issue of contract interpretation regards what renders an underlying

insurance policy unavailable under the contract.  In the process of seeking coverage for

damages arising from the underlying lawsuits, Plaintiffs have settled many of their claims

with underlying insurers for amounts less than the underlying policy limits.  Those

settlement agreements stated that payment by the underlying insurers of the agreed

amount(s) "exhausted" the policies.  Dec. of Berry ¶¶ 30, 35, 37, 40.  Plaintiffs rely on

this language to argue that the underlying insurance is, in fact, exhausted and therefore

unavailable.  Cincinnati rejoins that, under the specific terms of the contract, its duties

arise only in the event of full payment of the underlying policies.[20]

--------

      [20]Cincinnati first argues that Indiana law mandates that an excess insurer's liability is

(continued...)

We agree with Cincinnati.  Pursuant to the clear terms of § III.4 of the Cincinnati Policy, the availability of an underlying policy turns on whether the applicable limits of that underlying policy have been exhausted, or merely reduced, by payment of claims. With this distinction, the contract clearly requires that the underlying insurance "be exhausted or depleted by the actual payment of losses by the underlying insurer." Comerica Inc. v. Zurich American Insurance Co., 498 F.Supp.2d 1019, 1034 (E.D. Mich. 2007) (holding, *inter alia*, that, when an excess insurer bargains for a contract under which it will pay any damages beyond a given amount, it must be given the benefit of that bargain).  In other words, under the terms of the Cincinnati Policy, only full exhaustion, and not mere reduction, suffices to render the underlying insurance unavailable.

The language of the Cincinnati policy, like the language of the contract in Comerica, is clear, and the parties are bound by the agreement they made.  First Federal Savings Bank of Indiana v. Key Markets, Inc, 559 N.E.2d 600, 604 (Ind. 1990).  Plaintiffs cannot circumvent that clear intention embodied in the contract simply by branding each settlement with an underlying insurer an "exhaustion" of the policy, when, in fact, it

---

[20](...continued)
never triggered by a settlement between the insured and the primary insurer at an amount less than the policy's full coverage.  In support of this, Cincinnati cites United States Fire Ins. Co. v. Lay, 577 F.2d 421 (7th Cir. 1978).  However, although its reasoning applies in part, Lay is not entirely apposite.  Lay involved a settlement between both the insured and its primary insurer, on one side, and the underlying claimant on the other side.  In Lay, the court held that, because the underlying claimant agreed to an amount less than the underlying insurance coverage, no liability beyond that amount ever arose, so the excess coverage was never triggered.  Id. at 423. The issue in the case at bar, by contrast, involves a settlement between the insured, on one side, and the primary insurer, on the other, with no regard for the underlying claimant.

patently is nothing more than a "reduction" of the coverage under that policy.[21]  As the court in Comerica reasoned, to ignore language clearly drawing a distinction between reduction and exhaustion "would essentially require a holding that parties simply cannot contract for an excess policy to be triggered only upon full, actual payment by the underlying insurer."  Comerica, 498 F.Supp.2d at 1034; see also Qualcomm v. Certain Underwriters at Lloyd's, 161 Cal. App. 4th 184 (Cal. Ct. App. 2008).  Therefore, we hold narrowly that, based on the language of the contract at issue in this case, settlements executed by Plaintiffs at amounts less than full underlying coverage do not constitute "exhaustion" under the Cincinnati Policy.

Accordingly, Cincinnati's duties arise only in the event that *all* of Plaintiffs' relevant underlying insurance policies are *fully* exhausted.  As a review of these policies shows, Plaintiffs have not demonstrated that any of these underlying policies, either the one explicitly listed in the Schedule of Underlying Policies, or any of the other policies applicable to the occurrence, has been exhausted.

The underlying policy explicitly listed in the Schedule of Underlying Policies was issued by Regent Insurance Company ("Regent").  Although once a party in this case, on

---

[21]We are mindful of the policy concern that, in a case like the one at bar, an insured may face the harrowing possibility of "either [paying] out of her own pocket for the costs of defense up through a full trial, or [waiting] until coverage issues have been resolved definitively by the courts" before taking any action.  Midwestern Indemnity Company v. Laikin, 119 F.Supp.2d 831, 841 (S.D. Ind. 2000) (Hamilton, J.).  However, we also recognize the countervailing policy against binding Cincinnati to an agreement between Plaintiffs and another insurer.  Plaintiffs' and Cincinnati's rights under the policy must be determined by the terms of their own insurance contract.  See Irving Materials, Inc. v. Zurich American Ins. Co., 2007 WL 1035098, at *10 (S.D. Ind. Mar. 30, 2007) (Barker, J.).

May 17, 2005, Regent reached a settlement with Plaintiffs, agreeing to pay $3,000,000 in addition to the $151,231.87 Regent had previously paid, which those two parties agreed would "exhaust" the Regent policy and extinguish all of Regent's obligation.  Dec. of Berry ¶ 30.  The Regent Policy had a $1,000,000 "each occurrence limit," a $2,000,000 products-completed operations aggregate limit, and a $2,000,000 general aggregate limit.  According to Plaintiffs, these terms describe one policy with a $2,000,000 limit, which the settlement of $3,151,231,87 exceeded, thus exhausting the Regent Policy.  Id. at ¶ ¶ 28-29.

Cincinnati, in response, contends that the Regent Policy was actually two separate policies, and the settlement payment of $3,151,231.87 did not meet nor exceed the combined limit under these policies.   As Cincinnati points out, Plaintiffs paid separate premiums for the policies.  Furthermore, the settlement compromise reached by Plaintiffs and Regent was, in large part, an effort to resolve the disagreement between those two parties as to whether one or two policies, in fact, provided coverage.  Id.  Contrary to their current position, in those negotiations Plaintiffs asserted that they held two policies with Regent.  See id. at ¶¶ 29-30; Aff. of Reichers ¶ 25, Ex. A-15.  While Cincinnati has provided a detailed description and evidence supporting its position that Plaintiffs held two policies with Regent,[22] Plaintiffs do not offer any evidence or rationale indicating that

_____

[22]Cincinnati Insurance's contention with regard to the limits of the Regent Policy is best summarized in its own words, taken from an earlier briefing in this case: "Regent clearly issued two (2) separate CGL policies to Plaintiffs, the first with effective dates of coverage from August 29, 2000 through August 29, 2001, and the second with effective dates of coverage from January

(continued...)

29

there was only one Regent policy.  Therefore, we conclude that two underlying policies

existed, and that the settlement payment amount was clearly less than the combined

Regent Policy limits.  Thus, Plaintiffs' settlement reduced, rather than exhausted, the

underlying insurance provided by Regent, and the Regent Policy is not "unavailable"

under the terms of the Cincinnati Policy.

Plaintiffs similarly fail to provide evidence showing that any of the "other

underlying insurance policies" has been exhausted.  Plaintiffs admit that policies held

with various other insurers may provide coverage related to the underlying lawsuits, but

they contend that those policies have been exhausted.

The only evidence Plaintiffs adduce in support of their exhaustion argument is the

testimony of W. Mark Berry, Vice President of Risk Management of Beazer.  Berry

asserts generally that Plaintiffs have "exhausted" their underlying insurance by "reaching

settlement agreements" with each underlying insurer.  E.g., Dec. of Berry ¶¶ 30, 35, 37,

40.  Plaintiffs entered such agreements with Illinois Union Insurance Company,[23] FCCI

---

[22](...continued)
1, 2001 through January 1, 2002.  Depending on the nature of the claims made against Plaintiffs
within the Underlying Lawsuits, for which Plaintiffs sought coverage from Regent, Regent's
policies potentially provided both a two million dollar ($2,00,000) Products Completed
Operations Aggregate Limit and a Two Million Dollar ($2,000,000) General Aggregate Limit.
As a result, each of Regent's two (2) separate policies potentially provided a total amount of
Four Million Dollars ($4,000,000) in liability coverage for a total of Eight Million Dollars
($8,000,000) in coverage."  Cincinnati Insurance's Response to Plaintiffs' Motion for Partial
Summary Judgment [Docket No. 190], filed on February 17, 2006.

[23]Illinois Union Policy No. OGL-053947 (Commercial General Liability Policy), with an
aggregate limit of $1,000,000; and Illinois Union Policy No. XCP-053948 (Excess Coverage
(continued...)

Insurance,[24] American Employers' Insurance Company,[25] and One Beacon America

Insurance Company.[26]  Berry does not cite specific facts nor do Plaintiffs adduce any

evidence to support their position that the policies have, in fact, been exhausted.

   The general statements contained in one self-serving affidavit, which refers to no

specific facts, do not suffice to establish genuine issues for trial.  McGowan v. Deere &

Co. --- F.3d ----, 2009 WL 2901931, at *3 (7th Cir. 2009).  It is thus clear from the

evidence in the record that, under the language of the Cincinnati Policy, none of these

underlying policies has been exhausted, and Plaintiffs have failed to satisfy the

prerequisite of rendering their underlying insurance unavailable.[27]  Therefore, no

---

   [23](...continued)
Policy), with an aggregate limit of $4,000,000.  Plaintiffs maintain, incorrectly, that their
settlement with Illinois Union, under which Illinois Union agreed to pay $1,000,000, exhausted
the policies.  This settlement operated as a reduction in the coverage offered under the Illinois
Union policy, not as an exhaustion of that coverage.

   [24]Monroe Guarantee Insurance Company/FCCI Insurance Policy Nos. MG203794M-92
and MG203794M-93 (Commercial General Liability Policies); and Policy Nos. MG203794C-92
and MG203794C-93 (Umbrella Policies).  Plaintiffs have provided no evidence that this policy
has been exhausted.

   [25]American Employers Policy No. AIR630122 (Commercial General Liability Policy).
Plaintiffs have provided no evidence that this policy has been exhausted.

   [26]Commercial Union/One Beacon Policies No. CIDW15646 and CIDW46977 (Excess
Policies).  One Beacon issued two CGL policies to Plaintiffs, each of which had a $2,000,000
limit, as well as two excess policies that provided Plaintiffs with an additional $17,000,000, for a
total of $21,000,00 in coverage.  One Beacon and Plaintiffs eventually settled for $9,000,000.
This served to reduce, not exhaust, the policy.

   [27]We also note that Plaintiffs have provided little evidence supporting their claim that
their total alleged damages exceed the combined limits of all of their underlying policies.
Plaintiffs allege that they have incurred over $43 million dollars in damages.  Aff. of Reichers ¶
10, Ex. A-2.  However, Plaintiffs have not demonstrated sufficiently that these damages are
                                                              (continued...)

coverage is provided under the Cincinnati Policy.

Having concluded that "the insuring clause does not extend coverage," we need engage in no further analysis of the Cincinnati Policy.  Crossman, 2008 WL 817086, at *11 (citing Amerisure, 818 N.E.2d at 1005).  We therefore do not reach the questions relating to the specific duties to indemnify and defend, as they are defined in the policy.  Nor do we reach subsidiary questions related to the applicability of certain exclusions under the policy.

## V.  Motion for Oral Argument

Plaintiffs request oral argument for the purpose of clarifying the issues before the Court.  The record having been adequately developed through extensive briefing, there is no need for such a presentation by the parties.

## VI. Conclusion

For the reasons set forth above, Ohio Casualty's Motion for Summary Judgment is GRANTED; Cincinnati Insurance's Motion for Summary Judgment is GRANTED; Plaintiffs' Motion for Partial Summary Judgment Against Cincinnati Insurance is

---

[27](...continued)
subject to coverage.  Also, a conclusion that this amount exceeds the combined limits of all of Plaintiffs' underlying policies would depend on Plaintiffs showing what those limits are, which they have not done sufficiently.  Moreover, even if Plaintiffs have incurred an amount in excess of all underlying policies, they would still be required to exhaust those policies before the Cincinnati Policy would be triggered, something they have not done.

DENIED; Plaintiffs' Motion for Partial Summary Judgment Against Ohio Casualty is

DENIED; Plaintiffs' Motion for Oral Argument is DENIED; Plaintiffs' Motion to Strike

is GRANTED; and Defendants' Motion to Strike is DENIED.  Final Judgment shall be

entered accordingly.

IT IS SO ORDERED.

Date: _____09/25/2009_____

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Copies to:

Martin Jacob Gardner
Gardner & Rans, PC
mgardner@gardnerandrans.com

Scott A. Harkness
NORRIS CHOPLIN & SCHROEDER LLP
sharkness@ncs-law.com

Justin C. Jeffries
KING & SPALDING, LLP
jjeffries@kslaw.com

Bruce L. Kamplain
NORRIS CHOPLIN & SCHROEDER LLP
bkamplain@ncs-law.com

Zachary A. McEntyre
KING & SPALDING, LLP
zmcentyre@kslaw.com

J. Lee McNeely
MCNEELY STEPHENSON THOPY & HARROLD
jlmcneely@msth.com

Michael P. Misch
GARDNER & RANS PC
mmisch@gardnerandrans.com

Michael M. Raeber
KING & SPALDING, LLP
mraeber@kslaw.com

Kristy Marie Rans
GARDNER & RANS
krans@gardnerandrans.com