UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

| | | |
|---|---|---|
| TRINITY HOMES LLC and BEAZER HOMES INVESTMENTS LLC, | ) ) ) | |
| Plaintiffs, | ) | 1:04-cv-1920-SEB-DML |
| vs. | ) ) ) | |
| OHIO CASUALTY INSURANCE COMPANY, | ) ) ) | |
| Defendant. | ) ) | |

**ORDER ADDRESSING CROSS-MOTIONS FOR SUMMARY JUDGMENT**

This action for a declaratory judgment and damages has once more reached the

summary judgment stage.  After various settlements and rulings as well as a remand from

the Seventh Circuit, the remaining parties and issues have been pared considerably.

Trinity Homes LLC ("Trinity") and Beazer Homes Investments LLC (Beazer") remain

plaintiffs, but only Ohio Casualty Insurance Company ("Ohio Casualty") remains as a

defendant.  Ohio Casualty has filed a motion for summary judgment (Dkt. #409) on all

claims against it, and Trinity and Beazer have filed a cross-motion seeking partial

summary judgment (Dkt. #431) in their favor.  For the reasons detailed below, Ohio

Casualty's Motion for Summary Judgment is GRANTED IN PART and DENIED IN

PART, and Trinity and Beazer's motion is GRANTED IN PART and DENIED IN

PART.

## I.     Factual and Procedural Background

Trinity is an Indiana limited liability company with its principal place of business in Indiana and is one of several construction related companies owned by Beazer, which is a limited liability company incorporated under the laws of Delaware having its principal place of business in Atlanta, Georgia.   Beazer's predecessor, Beazer Homes Investment Corporation, acquired the stock of Crossman Communities, Inc. in 2002. Crossman and its subsidiary owned all interests in Trinity.  Beazer and Trinity are in the business of residential real estate development and construction.

Ohio Casualty's home office is in Ohio, where it is incorporated.  It sells insurance policies to commercial entities such as Plaintiffs.  It purchased a book of business from Great American Insurance Company, a subsidiary of which had sold commercial general liability policies ("CGL") and umbrella liability policies to Trinity, covering the period of time between May 1, 1994 through May 1, 1999.  For ease of reference, we will refer to these policies as the Ohio Casualty policies.  Trinity sold and acted as a general contractor for the construction of new homes in Central Indiana throughout the period of time in which the Ohio Casualty policies were in place.[1]

Beginning in 2002, purchasers of some of the new Trinity homes filed lawsuits or

---

[1]The parties dispute whether Trinity and Beazer, or Trinity alone, may claim coverage as an insured under the insurance polices.  Although Trinity is a subsidiary of Beazer, Trinity never sought to add Beazer as a named insured or additional insured under the policies.

asserted claims against Plaintiffs, alleging that the faulty work of Plaintiffs' subcontractors resulted in water intrusion, which in turn damaged various components of the purchasers' homes. Trinity set up a remediation protocol to investigate and repair damage to homes and the sources of water intrusion. One of the lawsuits filed against Trinity and Beazer by homeowners, *Colon v. Trinity Homes, LLC and Beazer Homes Investment Corp*., Indiana Cause No. 29D02-0404-PL-374, was a class action filed in Hamilton County, Indiana. The lawsuit alleged structural property damage within the class members' homes, and it is this lawsuit which underlies the remaining dispute in this coverage litigation.

The putative class in the *Colon* lawsuit included all owners of residential structures in Indiana constructed and marketed by Trinity and/or Beazer which were built without a one-inch gap and vapor barrier between the exterior brick veneer and the structural wall. In October 2004, a settlement class was certified which constituted a subset of the putative class and included those homeowners who had closed on the sale of a Trinity home between June 1, 1998, and October 31, 2002. The court-approved settlement incorporated the remediation protocol which Trinity had already started and which has resulted in the Plaintiffs paying out over $58,000,000 in investigative and repair costs. These payments included repairs to the homes of both class members and other homeowners who had asserted damage as a result of poor workmanship by Trinity's subcontractors.

In August 2003, Trinity and Beazer gave notice of the *Colon* class action to the insurance broker who had obtained its insurance coverage policies. Ohio Casualty's representative has testified that the company does not contest the timeliness of that notice. An email from that representative in June 2004 sets forth a general reservation of rights by Ohio Casualty and also refers to the broker, Hylant, as its agent. No defense to the *Colon* suit was provided by Ohio Casualty until 15 months following the notice which Trinity had given and, in September 2005, Ohio Casualty and the Plaintiffs reached a separate agreed resolution and release of any claims based upon the insurer's defense obligations.

Of the more than $58,000,000 paid out by Plaintiffs to investigate and repair water damage to homes, they claim that $7,877,647 was incurred for repair costs and expenses for homes which closed during the period of time the Ohio Casualty policies were in place. Plaintiffs assert that same amount to be the "maximum amount that Trinity could recover in indemnity" under both the CGL and umbrella policies, representing "property damage" for which they were liable. *Affidavit of William Fisher* at par. 12 (Dkt. # 430-1).

On September 25, 2009, we entered an order which granted summary judgment in favor of Ohio Casualty, finding that under Indiana law the cost of repairing faulty workmanship is not deemed property damage under the language of the insurance policies, if the damaged property is limited to the construction project itself. In so holding, we relied upon the body of then controlling case law in Indiana, including

*Sheehan Construction Company, Inc. v. Continental Casualty Company*, 908 N.E.2d 305 (Ind.Ct.App. 2009); *Amerisure, Inc. v. Wurster Const. Co.*, 818 N.E.2d 998, 1003 (Ind.Ct.App.2004); and, *R.N. Thompson & Associates, Inc. v. Monroe Guar. Ins. Co.*, 686 N.E.2d 160, 163 (Ind.Ct.App. 1997).  However, while our ruling was on appeal to the Seventh Circuit, the Indiana Supreme Court accepted transfer in the *Sheehan* case, vacating the Indiana Court of Appeal's 2009 opinion.  Thereafter, the Indiana Supreme Court issued an opinion which abrogated most of the analytical framework from the lower appellate court decisions upon which we had relied.  It did so by finding that faulty workmanship does constitute an accident, and therefore is a covered occurrence, so long as the faulty work fell outside of expectations or foresight.  *Sheehan Construction Co., Inc. v. Continental Cas. Co.,* 935 N.E.2d 160, 170-71 (Ind. 2010).  Recognizing that the "precedential landscape has changed,"  the Seventh Circuit sent our case back to us with instructions to reconsider our decision in light of the Indiana Supreme Court's decision in *Sheehan*, leaving for our determination "the application of any exclusions or limitations in the policy, as well as any other state law doctrines."  *Trinity Homes LLC v. Ohio Cas. Ins. Co.,* 629 F.3d 653, 657 (7th Cir. 2010).

## II.     Pertinent Language From The Insurance Policies

Though there were two CGL policy forms in place during the time span covered by the Ohio Casualty policies, the key language is identical in both policies. Under the broad grant of coverage for bodily injury and property damage liability, they both

provide:

> § I (1)(a) - We will pay those sums that the Insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. ...
>> (b) - This insurance applies to "bodily injury" and "property damage" only if:
>>> (1) the "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory"; and
>>> (2) the "bodily injury" or "property damage" occurs during the policy period.

There are exclusions to this broad general coverage provided by the CGL policies, one of which is designated "b. - Contractual Liability," which proscribes coverage for "'Bodily injury' or 'property damage' for which the Insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement." Another exclusion, "k. - Damage to Your Product," excludes "'property damage' to 'your product' arising out of it or any part of it."

Specific key terms within the policies are defined as follows:

"**Bodily injury**" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

"**Coverage territory**" means:
  a. The United States of America (including its territories and possessions), Puerto Rico and Canada;   . . . .

"**Occurrence**" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

"**Property damage**" means:
  a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of

the physical injury that caused it; or

   b. Loss of use of tangible property that is not physically injured.  All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

"**Your product"** means:

   a. Any goods or products, other than real property, manufactured, sold , handled, distributed or disposed of by:

      (1) you;

      (2) others trading under your name; or

      (3) a person or organization whose business assets you have acquired

      ...

"Your product" includes:

   a. warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product," ...

**"Your Work"** means:

   a. work or operations performed by you or on your behalf; and

   b. materials, parts or equipment or operations.

"Your work" includes:

   a. warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work"; and

   b. the providing of or failure to provide warnings or instructions.

Each of these policies also contains a provision which addresses the duties of an insured in the event of a claim, providing: "No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or occur any expense, other than for first aid, without our consent."

## III.    The *Sheehan* Decision

Justice Robert Rucker of the Indiana Supreme Court authored the *Sheehan* opinion which his colleague, Chief Justice Randall Shepard, respectfully described in his dissent

as "a genuine tour de force on the development of widely-used forms of commercial general liability policies and the interpretations given them by state and federal courts." *Sheehan Construction Co., Inc. v. Continental Cas. Co.,* 935 N.E.2d 160, 172 (Ind. 2010). That case came before the Indiana Supreme Court on a request for declaratory judgment filed by the insurer of Sheehan Construction Company, which had acted as the general contractor for a residential subdivision and had hired subcontractors to actually build the houses. *Id*. at 163. One of the homeowners who had experienced water damage, fungus and decay filed a lawsuit against Sheehan alleging that the damage was the result of the faulty workmanship of Sheehan's subcontractors. *Id.* Sheehan's CGL insurer, Continental Casualty, agreed to defend Sheehan under a reservation of rights, but after other homeowners successfully joined the lawsuit and transformed it into a class action, Continental filed a separate declaratory judgment action contending that it was not obligated to indemnify Sheehan under the language of its CGL policy, which policy language was, in most essential respects, identical to the language of the CGL policies at issue in this case. *Id*. at 164.

    At the outset of the *Sheehan* opinion, the Supreme Court noted that:

> The main issue in this case is whether a standard commercial general liability ("CGL") insurance policy covers an insured contractor for the faulty workmanship of its subcontractor.
> ...
> "[These] policies begin with a broad grant of coverage, which is then limited in scope by exclusions. Exceptions to exclusions narrow the scope of the exclusion and, as a consequence, add back coverage. However, it is the initial broad grant of coverage, not the exception to the exclusion, that

ultimately creates (or does not create) the coverage sought."

*Id.* at 162 (citing David Dekker, Douglas Green & Stephen Palley, *The Expansion of Insurance Coverage for Defective Construction*, 28 Constr. Law, Fall 2008, at 19, 20.)

After tracing the development of the standardized CGL form policy from its origins in the 1940s on through the 1986 iteration at issue in *Sheehan*, the Court described how recent Indiana Court of Appeals decisions had interpreted the risk intended to be insured by a CGL policy as "the possibility that the goods, products, or work of the insured, once relinquished or completed, will cause bodily injury or damage to property other than to the product or completed work itself." *Id.* at 165 (quoting *Amerisure, Inc. v. Wurster Constr. Co.*, 818 N.E.2d 998, 1003 (Ind.Ct.App.2004) which, in turn, quoted *R.N. Thompson & Assocs., Inc. v. Monroe Guar. Ins. Co.*, 686 N.E.2d 160, 162 (Ind.Ct.App.1997)). The Indiana Supreme Court disagreed with the prior appellate analysis which had concluded that exclusions, such as the "business risk exclusion," most often eliminate coverage in instances involving damage to an insured's own work or property. The Court found that there was no basis to conclude that the broader coverage afforded insureds through a CGL policy, prior to examining any applicable exclusions, would not be afforded to an "occurrence" of faulty workmanship that damages the contractor's own work or product. *Id.* at 167.

Admitting that the issue is one of considerable debate among lawyers and judges, the Court went on to identify the jurisdictions which have found that "faulty

workmanship or improper construction is not an 'occurrence' because it does not constitute an 'accident'," as well as those which have reached the opposite conclusion so long as the damage occurs without expectation, buttressing its analysis with scholarly articles advancing both viewpoints. *Id.* at 167-69. The Court focused on the existence of an exclusion in the CGL policy form for "your work," posing the question of why that exclusion would exist if the broader grant of coverage did not potentially include damage to the work of the insured or its subcontractors. *Id*. at 171. Finding no basis for such an exclusion, the Court concluded that the better reasoned interpretation of the CGL policy form is that faulty workmanship qualifies as an accident, and thus an "occurrence," if it happened without intention or design. *Id.* at 171-72. While the Court in *Sheehan* did not specifically state that damage caused by faulty workmanship was "property damage" under a CGL, its conclusion that faulty workmanship could be an accidental occurrence was based in large part upon a rejection of the notion that property damage could never involve damage to the home the contractor or his subcontractor's built.

IV.    **Discussion**

A.    **No "property damage."**

Ohio Casualty is apparently not impressed by the *Sheehan* decision, as it offers as its initial and most vigorous argument in favor of summary judgment the contention that the damage to the class members' homes does not constitute "property damage." The

insurer contends that in *Sheehan* the Court looked at whether faulty workmanship could be an accident and therefore an occurrence, and assumed that covered "property damage" existed. According to Ohio Casualty, the Indiana Supreme Court never addressed the "moral hazard" considerations whereby a general contractor might purposefully hire subcontractors, who are known to perform cheap but shoddy work, with the expectation that the insurer will pick up the tab for the repairs, if the poor quality is later discovered,. This is a risk we also noted in our September 25, 2009 order granting summary judgment to Ohio Casualty.

The insurer expands on this argument by noting that this is the same "moral hazard" that underlies the economic loss doctrine which the Indiana Supreme Court has recently reaffirmed as an important and enforceable legal doctrine under Indiana law. *See Indianapolis-Marion County Public Library v. Charlier Clark & Linard,* 929 N.E.2d 722 (Ind. 2010). The economic loss doctrine precludes recovery where an injury to a product or service results in a purely pecuniary loss. Ohio Casualty questions the consistency between the Indiana Supreme Court's decision in *Sheehan* to allow coverage to accrue under a CGL policy if a contractor or subcontractor negligently produces its work product and its reinforcement of the economic loss rule in *Indianapolis-Marion County Public Library*, handed down just three months earlier. In an effort to reconcile these apparently disparate holdings, the insurer urges us to hold that other exclusions within the CGL policy prevent it from providing coverage here.

As Chief Justice Shepard noted in his dissent, the decision in *Sheehan* leaves Indiana squarely on one side of the decisional divide with respect to "business coverage" under a CGL policy regarding consumer complaints as to quality. *Sheehan,* 935 N.E.2d at 172. Clearly, *Sheehan* was not a case in which the Supreme Court latched on to some technical factual distinction in order to find coverage. Indeed, the facts in Sheehan with regard to the nature of the subcontractor's negligence provide a near mirror image of the facts in the case before us. Consider the manner in which the *Sheehan* opinion clearly sets forth in its introductory paragraph the issue it was addressing:

> The main issue in this case is whether a standard commercial general liability ("CGL") insurance policy covers an insured contractor for the faulty workmanship of its subcontractor.

*Id*. at 162. The answer to that question as crafted by the Supreme Court was in the affirmative, and its opinion left no doubt that it was thereby abrogating the lower appellate court decisions in Indiana which had consistently found no coverage under a CGL in generally comparable circumstances because property damage could not be deemed to have occurred to the contractor's project, itself.

Ohio Casualty's contention that *Sheehan* failed to take into account the "moral hazzard" considerations arising when a blind eye can be permissibly cast on unqualified subcontractors does not capture accurately the Court's opinion. In the final paragraph of that decision, Justice Rucker wrote: "More specifically, if the defective work of the subcontractors were done intentionally instead of 'without intention or design,' then it is

not an accident." *Sheehan,* 935 N.E.2d at 172.  Before coverage can be determined under

such an insurance policy, an examination of the factual circumstances must be

undertaken.  The insurer must be able to satisfy itself, with respect to CGL policies, that

there was a lack of intent on the part of the insured or those acting under his direction and

control before coverage exists for claims based upon any accidental faulty workmanship.

While the Court in *Sheehan* did not discuss whether the "occurrence," that is, the

subcontractor's shoddy work, led to "property damage" in that case, it clearly determined

that the tangible property which experienced the "physical injury" so as to qualify as

"property damage" can include the construction project.  This holding left little else for

the Court to discuss, given the facts of that case.

Lord Tennyson's poetic reminder that, "Theirs is not to reason why" applies to

federal district court judges charged with applying state law.  Our task is simply to apply

Indiana law in a manner that conforms to the holdings of the highest court in that state, as

best we can divine it.  *Boland v. Engle*, 113 F.3d 706, 710 (7th Cir. 1997).  *Sheehan* makes

our task fairly straightforward.  We need not entertain or speculate as to the divergent

doctrinal paths that the Indiana Supreme Court could have taken with respect to

rationalizing its interpretation of the economic loss rule in *Indianapolis-Marion County*

*Public Library* with its analysis of the  coverage issue under a CGL policy when the

underlying facts involve the unintentional sub-par workmanship by subcontractors under

*Sheehan*.  Despite our obviously limited and straightforward role, a couple of comments

from us nonetheless seem appropriate under the circumstances before us.

While *Sheehan* has clearly abrogated the analytical progression of Indiana decisional law developed over several decades with respect to the nature and extent and meaning of property damage, which history we embraced in our September 25, 2009 order, we nonetheless should make the effort required of us to examine the various additional arguments advanced by Ohio Casualty in support of its view that a finding of no coverage should be entered here, despite the clarity of the *Sheehan* decision. Ohio Casualty recognizes that the economic loss doctrine limits the available remedy for a loss from a defective product or service to an action in contract, because the loss is solely economic in nature. *Gunkel v. Renovations, Inc.*, 822 N.E.2d 150, 152 (Ind. 2005). But the economic loss doctrine is a remedies doctrine; thus, it has no application to an insurance coverage dispute. As noted by Plaintiffs, other courts have recognized that the economic loss doctrine has nothing to do with the issue of coverage under an insurance policy. *E.g., Lamar Homes, Inc. v. Mid-Continent Cas. Co.,* 242 S.W.3d 1 (Tex. 2007)(finding coverage under CGL policy applicable to damage claims based upon faulty workmanship in building home foundation and rejecting economic loss rule as a "test for coverage"). Based on the Indiana Supreme Court's decision in *Sheehan,* we assume it would reach the same conclusion.

**B.     Exclusions**[2]

Addressing the issue of whether Ohio Casualty's policy exclusions dictate a denial

of coverage, Plaintiffs claim that Ohio Casualty is estopped from making such arguments

because it did not provide a defense to the *Colon* lawsuit or take a position on the issue of

coverage for many months following its receipt of notification of the claim, thus forcing

Plaintiffs to protect their own interests by filing this litigation.  In making this argument,

Plaintiffs rely on a Seventh Circuit decision interpreting Indiana law, *Federal Ins. Co. v.*

*Stroh Brewing Co.*, 127 F.3d 563 (7th Cir. 1997).  Ohio Casualty contends that the

analysis of  *Stroh Brewing* was expressly rejected by the Indiana Supreme Court in  *State*

*Farm Fire & Cas. v. T.B. ex rel Bruce*, 762 N.E.2d 1227 (Ind. 2002), which clarified

Indiana law with regard to any alleged waiver of defenses.  Furthermore, for a court to

find that an insurer waived a defense or is estopped from asserting one, there must be a

finding of prejudice, which Ohio Casualty maintains has not been demonstrated by

Plaintiffs.  Alternatively, Ohio Casualty argues that estoppel and waiver are fact

dependent and material questions of fact remain.

Delay alone is generally insufficient to establish estoppel against, or an implied

---

[2]In their brief in support of partial summary judgment, Trinity and Beazer argue that the
policy exclusions captioned "Expected or Intended Injury," "Your Work," and "Your Property"
do not apply to their claims.  Ohio Casualty has not asserted that those exclusions apply and has
taken no issue with their being non-factors; therefore, they have no influenced our discussion.

waiver of defenses by, an insurance company.[3]  *Protective Ins. Co. v. Coca–Cola Bottling Co.*, 423 N.E.2d 656, 662 (Ind.App.1981) ("only where the insured is prejudiced as a result of the unreasonable delay is the insurer estopped to assert noncoverage").  One way to establish prejudice is by showing that the insured was lulled into the belief that it was covered by the policy and that the insurer would defend it.  *Id.*  However, other avenues to demonstrate prejudice are not foreclosed.  In the end, we can not, on the record before us, determine the issue of prejudice as a matter of law.  If no coverage existed for the claims made in *Colon*, then mere payment on or settlement of the claims is not prejudicial; Plaintiffs would need to show more.  In short, a more developed record is required on this issue.  Nevertheless, even assuming that Ohio Casualty is not estopped from asserting the policy exclusions, the exclusions Ohio Casualty seeks to invoke do not apply, as we explain below.

Ohio Casualty contends that the "Damage to Your Product" exclusion applies to bar coverage here; Plaintiffs respond noting that the exclusion specifically excepts real estate.  Ohio Casualty describes the Trinity home sales agreements as encompassing two independent transactions – the sale of the underlying lot and the construction of a residence upon the lot.  Accordingly, the insurer asserts that the analysis in *McKinney v.*

---

[3]As the Indiana Supreme Court has recently noted, though there are clear differences between implied waiver and estoppel as legal doctrines, they are common terms which courts use interchangeably when discussing insurance law issues because it is an area of law where such distinctions are more difficult to preserve.  *Ashby v. Bar Plan Mut. Ins. Co.,* 949 N.E.2d 307, 313 (Ind. 2011).

*State*, 693 N.E.2d 65 (1998) applies, wherein the Indiana Supreme Court found that a home building contract did not qualify as a "transaction in real estate" and thus required a showing of "intent" under the Indiana Deceptive Consumer Sales Act, Ind. Code § 24-5-0.5-1 to 12.[4]

However, determining the meaning of "transaction in real estate" for purposes of the Indiana Deceptive Consumer Sales Act, a statute which is to be liberally construed to effect its purpose, is different from determining the meaning of the term "real property" in an insurance policy exclusion or exception. Regarding such interpretations of policy provisions, the Court's responsibility is to determine the plain meaning of terms, construing ambiguities in favor of the policyholders. *Morris v. Economy Fire & Cas. Co.*, 848 N.E.2d 663, 666 (Ind. 2006). Whether one consults a legal or standard English language dictionary, "real property" includes both the land and buildings upon it.[5] The

---

[4]In support of finding the "Damage to Your Product" exclusion applicable, Ohio Casualty also cites to *Jim Barna Log Systems Midwest, Inc. v. General Cas. Ins. Co. of Wisconsin,* 791 N.E.2d 816 (Ind.App. 2003). However, in *Jim Barna* the Indiana Court of Appeals adopted as dicta the analysis which the Supreme Court of Indiana rejected in *Sheehan*, namely, that a CGL policy covers only damage to property other than the product or work of the contractor. *Id.* at 828. For that reason, reliance on that dicta would now be error.

[5]Black's Law Dictionary defines "real property" as "land and anything growing on, attached to, or erected on it, excluding anything that may be severed without injury to the land ... [and it] can be either corporeal (soil and buildings) or incorporeal (easements)."). BLACK'S LAW DICTIONARY 1234 (7th ed.).

*Dictionary.com* , a modern American on-line dictionary, defines "real estate" as "an estate or property consisting of lands and all of the appurtenances to lands, as buildings, crops or mineral rights (distinguished from personal property).
http://dictionary.reference.com/browse/real+property?s=t.

policy before us clearly excepts "real property" from the "Damage to Your Product" exclusion, and any insured would be justified in interpreting that exception to include a home which was sold along with the ground under it. Clearly, the contracts between Trinity and the homeowners conveyed both the real estate and the attached dwelling in exchange for payment of a single, inclusive purchase price.

Another provision which Ohio Casualty contends bars coverage here is the "Contractual Liability" exclusion, which relates to damages the insured must pay having assumed liability through a contract. Ohio Casualty maintains that because the economic loss rule precludes class members from recovering under a tort theory, any liability flowing to Trinity must arise on the basis of its home sales contracts.

We note that the underlying class action included a negligence claim, which bases damages on a potential liability beyond the alleged breach of contract. We have previously addressed the reason(s) the economic loss doctrine has no application with respect to an insurance coverage dispute. Furthermore, courts typically interpret contractual liability exclusions in the context of an express contractual assumption of liability by the insured, which is not the circumstance presented here. *See Selleck v. Westfield Ins. Co.*, 617 N.E.2d 968 (Ind. Ct. App. 1993) (holding that contractual liability exclusion in an automobile insurance policy applied to bar coverage when a father had agreed to be liable for his son's negligent acts under the financial liability agreement in the son's driver license application); *see also, generally* 3 Jeffrey E. Thomas, NEW APPLEMAN

ON INSURANCE LAW § 18.03[3][a] (Lib. Ed. 2011)("On its face it may appear that this exclusion applies to bar all contract liability but, in fact, the exclusion is limited to a special type of contract - one in which the insured has assumed the liability of another, i.e., a hold harmless or indemnification agreement."); 1 Barry R. Ostrager & Thomas R. Newman, HANDBOOK ON INSURANCE COVERAGE DISPUTES § 7.05, 546 (14th ed. 2008) ("[C]ourts have consistently interpreted the phrase 'liability assumed by the insured under any contract' to apply only to indemnification and hold-harmless agreements, whereby the insured agrees to 'assume' the tort liability of another. This phrase does not refer to the insured's breaches of its own contracts.").

Though Ohio Casualty reminds us in its brief that the principle underlying the economic loss doctrine is that business risks which are capable of being allocated via the contract provisions should be allocated by that means, rather than according to tort law principles, Ohio Casualty fails to cite any language in the warranty provisions of the home sales contract which accomplishes an express assumption of liability covering the risk at issue here. In the end, we conclude that under Indiana law neither the "Damage to Your Product" nor the "Contractual Liability" exceptions to coverage in the CGL policy applies to the circumstances before us.

C.    Endorsement CG 8802

Ohio Casualty contends that with respect to the two most recent CGL policies it

issued to Trinity covering the time period between May 1, 1997 and May 1, 1999, a general endorsement effectively limited the coverage to $25,000 per year for each of those two years. The analytical path necessary to reach this conclusion is circuitous at best, but it clearly discloses the inherent ambiguity caused by this particular endorsement language.

In pertinent part, "Business General Endorsement" CG 8802 provides as follows:

COVERAGE FOR SPECIAL BROAD FORM PROPERTY DAMAGE LIABILITY (CONTRACTORS)
THIS ENDORSEMENT MODIFIES INSURANCE PROVIDED UNDER THE FOLLOWING:
COMMERCIAL GENERAL LIABILITY COVERAGE PART

1.       ...
2.       Section III, Limits of Insurance
         Paragraph 8 is added
         8.  Subject to 2 or 3 above, whichever applies, Coverage A  Property Damage Liability for damages because of "Property Damage" **to property c[ov]ered on an excess basis in 4.B.** Other Insurance of Section IV shall be subject to the following sublimits:
         $25,000 for damages because of "Property-Damage" arising out of any occurrence, and
         $25,000 all damages because of "Property-Damage" arising out of all occurrences in each consecutive annual period called an Annual Aggregate and starting with the beginning of the policy shown in the declarations, unless this policy is extended after issuance for a period of less than 12 months. In that case the additional period will be deemed part of the last preceding period for the purpose of determining the Annual Aggregate. (emphasis added).
3.       ...

This insurance is subject to a deductible of $5,000. each occurrence.

The "Other Insurance" provision set out in the policy, referenced above in the bold print portion of excerpt from the endorsement, provides as follows:

**Section IV** ...
**4.  Other Insurance**
If other valid and collectible insurance is available to the Insured for a loss we cover under Coverages A or B of this Coverage Part, our obligations are limited as follows:
**a. Primary Insurance** . . .
**b. Excess Insurance**  This insurance is excess over any other insurance, whether primary, excess, contingent or on any other basis:
(1) that is Fire, Extended Coverage, Builder's Risk, Installation Risk or similar coverage for "your work";
(2) that is Fire Insurance for premises rented to you; or temporarily occupied by you with permission of the owner.
(3) if the loss arises out of the maintenance or use of aircraft, "autos" or watercraft to the extent not subject to Exclusion g. of Coverage A (Section I).

Ohio Casualty maintains that the language of paragraph 2 of the exclusion (quoted above), when viewed in conjunction with the other paragraphs of the exclusion and policy, transforms the policy's property damage coverage into $25,000 in excess coverage with a $5,000 deductible, thus making the $25,000 in excess coverage available to the insured where no coverage was otherwise available.  Ohio Casualty summarizes this contention as follows:

It is clear that the language and intent of CG 8802's Special Broad Form Property Damage Liability Endorsement is to make available to Trinity the additional sublimits of $25,000 per occurrence subject to a $5,000 deductible, as granted by the endorsement, to apply as excess insurance above the fire, extended coverage, builder's risk, installation risk, or similar coverage for "your work," which would otherwise not be covered (but for the removal of the exclusion in paragraph 1) and which is not otherwise excluded by the policy language.

Ohio Casualty's Brief in Support of Summary Judgment, pg. 23.  We do not find this argument persuasive, largely because it lacks clarity with respect to the actual meaning of

the endorsement to which Ohio Casualty refers.

In any event, we agree with Trinity's assessment that such analytical gymnastics are not required here. Both sides agree that the endorsement limits coverage where the insurance coverage exceeds the types of insurance listed in Section IV, paragraph 4.b of the policies. However, Ohio Casualty contends that, rather than identifying specific types of insurance, Section IV, paragraph 4.b requires that the Policies are excess over "*any other insurance*," invoking those words found within that section. In our view, one must read the words, *"any other insurance*," in context, which includes the language preceding the three subsections under 4.b, to wit: "any other insurance ... (1) *that is* Fire, Extended Coverage, Builder's Risk ... (2) *that is* Fire Insurance ... (3) *if* the loss arises out of the maintenance o use of aircraft ...." Ohio Casualty contends that these three subsections do not provide context to "*any other insurance*"; rather, that phrase stands on its own. We will not adopt such a strained interpretation requiring us to ignore the clearly modifying subsections.

At a minimum we can say that the endorsement is ambiguous and thus, according to long standing principles of Indiana law, ambiguities are to be construed in favor of coverage. *Utica Mut. Ins. Co. v. Ueding,* 370 N.E.2d 373, 376 (Ind.App. 1977). This ambiguity increases in light of Ohio Casualty's own representative's admissions by deposition that there is another endorsement to the policy, specifically CG 8106, which, like CG 8802, purports to delete and substitute policy exclusion language under the same

policy section.  When asked during his deposition which endorsement he believes to take precedence, Ohio Casualty's representative answered: "That's a good question.  I don't know."  In the end, we will not embrace the exaggerated constructs of the policy interpretation pressed on us by Ohio Casualty.

### D.     Voluntary Payments

Ohio Casualty claims that Trinity has made repair payments to 54 owners of homes, the sales of which closed prior to the triggering date for the *Colon* class action settlement and, consequently, those payments were voluntary rather than an amount Trinity was "*legally obligated to pay as damages*," which requirement triggers coverage.  The owners of those 54 homes were members of the putative class, but they ultimately did not become members of the settlement class.  Ohio Casualty claims it is not obligated to indemnify Trinity for the amounts Trinity paid to those 54 homeowners because there was no determination of liability or court approved settlement requiring such indemnification and, in fact, each CGL policy clearly provides:  "No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or occur any expense, other than for first aid, without our consent."

Trinity's response is straightforward: it made no voluntary payments.  The homeowners had legitimate claims of which Ohio Casualty was apprised in timely fashion and thus they were part of the original putative class in *Colon*.  The same guidelines which

were incorporated into the class settlement were applied in resolving the claims of those outside the class, about whom the insurer had full knowledge and was kept regularly apprised. The fact that these 54 claimants were ultimately omitted from the settlement class is irrelevant, according to Trinity, because Indiana law does not require entry of a judgment as a condition precedent to an insured's legal obligation to pay. *See Indiana Ins. Co. v. Ivetich,* 445 N.E.2d 110, 112 (Ind.App. 1983)(An insurer which has induced the insured to effect self-help to protect itself may not later hide behind the language of the policy and the lack of a judgment to avoid its duty to defend or insure). In addition, Plaintiffs contend that Ohio Casualty is estopped from asserting this defense.

Plaintiffs' reliance on *Ivetich* is misplaced. *Ivetich* involved vehicles which were stolen after they had been left for repair with an insured's repair shop. *Id*. at 110. The repair shop had promised to repair and return the vehicles. *Id.* The Indiana Court of Appeals made clear that, by operation of law, the insured had become legally obligated to make payment to the vehicle owners for the stolen vehicles based on his promise to return the cars – not just repair them. *Id.* at 112. In the case at bar, Plaintiffs are unable to establish that they had any legal obligation to pay for the damages to the houses belonging to homeowners who were ultimately not included in the settlement class. We find no support in the record that notice was given to the insurer by Plaintiffs of any separate claim relating to these losses.

However, there is evidence that the insurer was aware that there were homes owned

by individuals outside the settlement class which were being repaired in conjunction with the settlement protocol and yet they interposed no objections to coverage for those claims. Monthly "spreadsheet" reports provided by Plaintiffs to the insurer reflected homes with escrow closing dates which were beyond the dates included for the class. That said, the record is deficient as to details respecting the specifics of the timing of repairs on these homes, the nature and extent of these repairs at each home, and whether the insurer had sufficient opportunity to timely object to payments beyond the reservation of rights it had initially asserted. We cannot determine in light of the sparse record before us whether Trinity will succeed in demonstrating "prejudice" sufficient to estop Ohio Casualty from asserting this defense. Thus, we withhold a ruling that would deem the payments made on the repairs to the 54 non-class settlement homes to have been voluntary and leave the issue for trial whether the insurer is estopped from raising such a defense.

### E.     Is Beazer An Insured?

Ohio Casualty argues that Beazer is not an insured under either the CGL or the umbrella polices because Trinity never sought to have itself added as an insured and Beazer did not acquire its ownership interest in Trinity until the period of coverage provided by the polices at issue had expired and no transfer of policy interests was accomplished. *See Travelers Cas. And Surety Co. v. United States Filter Corp.,* 895 N.E.2d 1172, 1178 (Ind. App. 2008). Beazer responds that it really does not matter whether it was an insured because the homes were built by Trinity and the homeowner

claims against Beazer have been asserted in its capacity as the parent entity of Trinity, which imposes no additional risk of any kind. Further, it argues, because the policy provides that members of an insured LLC such as Trinity are insureds as well, Beazer is an insured on that basis as well.

We agree with Beazer that this argument from Ohio Casualty is of no consequence to our rulings here because, from a practical standpoint, it does not matter whether Beazer is an insured, so long as Trinity is an insured and the claims against Beazer in *Colon* arise out of its status as the parent corporation. On the other hand, we also agree with Ohio Casualty that all of the changes in ownership among these entities occurred after the coverage period had expired and therefore Beazer's only possible claim to coverage would be, as found in our order of March 30, 2007, as a successor-in-interest. Beazer's claim as we understand it is that, as a member of the successor-in-interest, Trinity LLC, it is entitled to coverage. We find no basis in the policy to allow such an addition after the coverage period has ended. Consequently, we hold that Beazer as such is not an insured under the policies, but that that conclusion is immaterial.

### F.      Triggering of Umbrella Policies

Ohio Casualty contends that its umbrella policies have never been triggered. The only underlying policies triggering umbrella coverage are Ohio Casualty's own  CGL policies which provide  $2,000,000 in aggregate coverage each year over the course of the

applicable five year period. Plaintiffs assert that they have incurred more than $58,000,000 in investigative and repair costs and that with respect to the 243 houses which closed just during the final year alone of Ohio Casualty's coverage period, there were approximately $5.3 million in repair costs, which is more than double the $2 million aggregate limit for that year. Since the precise calculation of damages must be developed and defended at trial, we will defer the umbrella coverage issues until then.

Plaintiffs fail to mention the first four years of umbrella coverage under the Ohio Casualty policies, perhaps due to its prior admissions addressing the application of another insurer's umbrella policies that the limits of the Ohio Casualty CGL policies could not be reached for those time periods. However, deciding this issue at this point does nothing to advance a resolution of the issues reserved for trial, so we will go no further in our discussions of this matter at this time.

### G.     Indemnification For Damages Arising Out Of The Occurrence

We have thus far determined that coverage under the Ohio Casualty CGL policies and potentially its umbrella policies applies to the property damage to the homes constructed by Trinity's subcontractors which arose out of the faulty workmanship of those subcontractors, which qualifies as an "occurrence" under the policy. No exclusions to coverage apply and material questions of fact prevent us from determining as a matter of law whether the payments made to 54 homeowners who were not included in the

settlement class in the underlying class action were voluntarily made, and thus unrecoverable, or whether Ohio Casualty is estopped from asserting such a defense to those claims.

The final issue raised by the cross motions for summary judgment is whether coverage exists for "all" damages for which Trinity becomes liable arising out of each occurrence or whether it is liable only for "those" damages which arose during the relevant policy period.

In *Allstate Ins. Co. v. Dana Corp.*, 759 N.E.2d 1049, 1058 (Ind. 2001)("*Dana II")* the Indiana Supreme Court interpreted Allstate insurance policy provisions stating that it would pay "all sums" which Allstate "shall be obligated to pay" based on property damage "caused by an occurrence," to provide indemnification for "all sums," not just those sums accruing as a result of damages which arose during the policy period. We have previously interpreted policy language similar to the indemnity language before us as being distinguishable from that at issue in *Dana II.*

*Irving Materials, Inc. v. Ohio Cas. Ins. Co.,* 2008 WL 687126 (S.D. Ind March 10, 2008), was a case involving multiple insurers and multiple policies, and damages arising over multiple coverage periods, not unlike the circumstances here emanating from the class settlement in *Colon*. In *Irving Materials,* we examined the following provision of another Ohio Casualty policy:

> We will pay on behalf of the "Insured" those sums in excess of the
> "Retained Limit" that the "Insured" becomes legally obligated to pay by
> reason of liability imposed by law or assumed by the "Insured" under an
> "insured contract" because of ... "property damage," ... that takes place
> during the Policy Period and is caused by an "occurrence" happening
> anywhere.

*Id.* at *5. We addressed the differences between this language and the "all sums"
provision discussed in *Dana II*, and questioned the reasoning of a ruling by the Lake
Superior Court in *State Farm Fire & Casualty v. Anthony J. Cefali*, Cause No.
45D04-0507-PL-00030 (Jan. 25, 2007), proffered by Trinity as support for a conclusion
that the policy provision of "those sums," is not actually distinguishable from "all sums"
and, therefore, Ohio Casualty, like the insurer in *Dana II*, is on the hook for all the
damages arising from each occurrence.

In undertaking our analysis in *Irving Materials,* in contrast to the situation in *Cefali,*
we were not focused exclusively on the distinction between "those sums" and "all sums."
Rather, we found persuasive the fact of additional specific policy language providing that
the insurer would indemnify property damage "that takes place during the Policy Period."
Here, as in *Irving Materials,* the policy not only uses the term "those sums" in lieu of "all
sums," it further qualifies its indemnity obligation, as evidenced by the highlighted
language below:

> § I (1)(a) - We will pay those sums that the Insured becomes legally
> obligated to pay as damages because of "bodily injury" or "property
> damage" to which this insurance applies. ...

(b) - **This insurance applies to** "bodily injury" and **"property damage" only if:**

(1) the "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory"; and

(2) **the** "bodily injury" or **"property damage" occurs during the policy period.**

Accordingly, we reach here the same conclusion we did in *Irving Materials*, namely, that Ohio Casualty is obligated to indemnify Trinity only for damages arising during its policy periods for pro rata liability as opposed to several and indivisible, by reason of its having limited its indemnity obligation to "those sums" that Trinity becomes liable to pay for property damage which "occurs during the policy period.[6]"

## V.    Conclusion

For the reasons explicated in this entry, Ohio Casualty Company's Motion For Summary Judgment (Dkt. #409) is GRANTED IN PART, that is, to the extent that Beazer is not an insured under the Ohio Casualty insurance policies, but the motion is DENIED in all other respects.

Trinity and Beazer's Motion For Partial Summary Judgment (Dkt. #431) is GRANTED IN PART, that is: (1) Trinity is an insured under the Ohio Casualty CGL and

---

[6]In responding to Trinity and Beazer's summary judgment motion and specifically the issue of how damages might be apportioned between insurers, Ohio Casualty raised an issue with respect to limitations of its coverage based on "time on the risk." As summary judgment was not sought on this issue, we have not addressed it in this ruling.

umbrella policies in effect for the time period from May 1, 1994 to May 1, 1999; (2) the claims at issue in the Underlying Lawsuits are "property damage" claims resulting from an "occurrence" and are therefore within the policy coverage provided under the Ohio Casualty Policy; and (3) none of the exclusions in the Ohio Casualty Policy bars coverage. Trinity and Beazer's Motion is DENIED in all other respects. Moreover, material questions of fact remain with respect to whether payments made to the 54 homeowners, who were part of the putative class in the underlying *Colon* class action but were not included in the certified settlement class, were voluntary payments and as such do not qualify for indemnification. Material questions of fact also preclude a summary ruling on the issue of whether Ohio Casualty is estopped from raising their voluntary nature as a defense to indemnity.

IT IS SO ORDERED.

Date: _____03/29/2012_____

_Sarah Evans Barker_____

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Copies to:

Martin Jacob Gardner
Gardner & Rans, PC
mgardner@gardnerandrans.com

Scott A. Harkness
NORRIS CHOPLIN & SCHROEDER LLP
sharkness@ncs-law.com

Justin C. Jeffries
KING & SPALDING, LLP
jjeffries@kslaw.com

Bruce L. Kamplain
NORRIS CHOPLIN & SCHROEDER LLP
bkamplain@ncs-law.com

Zachary A. McEntyre
KING & SPALDING, LLP
zmcentyre@kslaw.com

J. Lee McNeely
MCNEELY STEPHENSON THOPY & HARROLD
jlmcneely@msth.com

Michael M. Raeber
KING & SPALDING, LLP
mraeber@kslaw.com

Kristy Marie Rans
GARDNER & RANS
krans@gardnerandrans.com